FILED
14 JUL 15 PH 1: 45

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INDICTMENT 1:14CR237 |
| | ) | |
| Plaintiff, | ) | JUDGE: _____ |
| | ) | |
| v. | ) | CASE NO. ___ JUDGE PEARSON |
| | ) | 18 USC § 1349 |
| | ) | 18 USC § 1956(h) |
| ROBERT LEE EVANS, | ) | 18 USC § 1001 |
| Defendant. | ) | |

## GENERAL ALLEGATIONS

At all times material and relevant to this Indictment:

### The Defendant

1.     The defendant ROBERT LEE EVANS was a resident of Parma, Ohio, which is located in the Northern District of Ohio, Eastern Division. ROBERT LEE EVANS was co-founder and co-owner of a legal research firm known as Holowatyj, Roza, & E. Law Research L.L.C., (hereinafter referred to as "HRE").

### COUNT 1

The Grand Jury charges:

2.     From in or about at least April 2011, and continuing to in or about September 2012, the exact dates unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, and elsewhere, the defendant,  ROBERT LEE EVANS, and others known and

2

unknown to the Grand Jury, did knowingly and voluntarily combine, conspire, confederate and

agree together and with each other, and with diverse others known and unknown to the Grand

Jury, to violate the laws of the United States, that is, to devise and intend to devise a scheme and

artifice to defraud prison inmates in federal and state prisons, and their families, and to obtain

money and property from them by means of false and fraudulent pretenses, representations, and

promises, and for the purpose of executing and attempting to execute the scheme and artifice to

defraud:

   a. Knowingly placing and causing to be placed in any post office and authorized
      depository for mail matter, any matter or thing, to be delivered by the Postal
      Service and any private and commercial interstate mail carrier according to the
      direction thereon, in violation of Title 18, United States Code, Section 1341; and

   b. Causing to be transmitted by means of wire communication in interstate
      commerce, writings, signs, signals, pictures and sounds, in violation of Title 18,
      United States Code, and Section 1343.

### Object of the Conspiracy

   3.    The object of the conspiracy was to enrich defendant ROBERT LEE EVANS by

fraudulently obtaining thousands of dollars from inmates, in federal and state custody, their

families and loved ones by playing on their hopes and desires to obtain a favorable or less

onerous resolution of their or their family members' criminal charges.

### Manner and Means

   It was part of the conspiracy that:

   4.    ROBERT LEE EVANS himself, and through inmates, recruited incarcerated

inmates as clients of his legal research firm.  EVANS described his services as a full service legal

3

research firm and that he would help the inmate find an attorney and generally encouraged the

newly-recruited clients to change attorneys and hire those he recommended.

5.    ROBERT LEE EVANS told the clients that he was a private investigator and

would assist the attorney throughout the court process. All fees were paid to EVANS who would

then pay the attorney for legal services. EVANS required a substantial retainer to be paid before

any work would be done for the client.

6.    As matters proceeded and the clients wanted more favorable results, ROBERT

LEE EVANS would play on their desires for reduction in potential sentences and would tell them

he had an "ace in the hole" option. EVANS explained his plan involved two phases:  the first

involved EVANS arranging for someone to provide significant cooperation to law enforcement

on the client's behalf thereby acquiring for the client "third party assistance" credit at the time of

the client's sentencing; and second, assurances that a motion would be filed by the government

after the client serves part of his sentence and a sentence reduction would be granted. EVANS

required substantial additional payment for the "ace in the hole" treatment.

7.    Once the client agreed to go forward with the "ace in the hole" plan, EVANS

would tell the client and/or his family that some third party cooperation had already occurred and

the client would get credit, when in fact there had been no such cooperation. He would then

press the client for more money.

8.    ROBERT LEE EVANS and an unindicted co-conspirator opened bank accounts

in the name of HRE to deposit payments from clients, make payments relating to the scheme to

defraud and withdraw proceeds of the fraudulent activities.

4

9.      An unindicted co-conspirator acted as a liaison with the fiancé of an inmate targeted for the scam.

10.      ROBERT LEE EVANS used stationary, letterhead and a business card from a law office where he had previously worked to entice the father of an inmate serving time in a Bureau of Prisons facility at Fort Dix, New Jersey, to hire him and pay a retainer for his services.

## Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, and to effect the objects thereof, the defendant in the Northern District of Ohio, and elsewhere, performed the following acts:

11.      On or about April 15, 2011, ROBERT LEE EVANS filled out a Client Intake Form for a person, known to the grand jury and hereinafter referred to as Victim #1.

12.      On or about April 28, 2011, ROBERT LEE EVANS had Victim #1 sign a Client Contract.

13.      On or about April 28, 2011, ROBERT LEE EVANS received a $6,179 check from Victim #1.

14.      On or about sometime in late spring to the summer of 2011, ROBERT LEE EVANS, told Victim #1's son (hereinafter Inmate #1), who was then an inmate at the BOP facility in Fort Dix, New Jersey, that a "sting" was being set up and he, the inmate, would get credit from law enforcement for the "sting" and his sentence would be reduced.

15.      In or about early January 2012, ROBERT LEE EVANS spoke to the mother and brother (hereinafter Victim #2) of a person then incarcerated in the Northeast Ohio Correctional Center (hereinafter "NEOCC"), Youngstown, Ohio, (hereinafter Inmate #2) about obtaining a

5

favorable result in Inmate #2's case for a fee. At that time, Victim #2 was also facing criminal

charges and he had a conversation with ROBERT LEE EVANS about EVANS helping Victim

#2. EVANS told him about third party assistance and how it could help him. EVANS said he

knew a person who was a former Marine named "Billy" whose street name is "LT." EVANS

explained that Billy set up people to be busted by law enforcement. Billy would communicate

with the agents working the case that he was assisting on the bust in order to give third party

credit to another. In this case, Billy would be setting up another to credit Victim #2.

16.     In or around January 26, 2012, ROBERT LEE EVANS, during a telephone

conversation, encouraged Inmate #2 to get a retainer paid. EVANS stated, "We need that like

ASAP, man. You know what I mean?"

17.     In or around late January 2012, an inmate at NEOCC referred another inmate

(hereinafter Inmate #3) to ROBERT LEE EVANS. Thereafter Inmate #3 and his fiancé

(hereinafter Victim #3) spoke with ROBERT LEE EVANS about EVANS' services and what he

could accomplish on behalf of Inmate #3.

18.     On or about February 3, 2012, ROBERT LEE EVANS, during a telephone

conversation with Inmate #2, asked "What's going on with your family, man?" Inmate #2

responded, "They're getting the money together, man." During this conversation, EVANS told

Inmate #2 that he was supposed to do some things for Inmate #2's brother.

19.     On or about February 4, 2012, Inmate #3 signed a flat fee contract with ROBERT

LEE EVANS for $20,000. This was after EVANS told Inmate #3 and Victim #3 that his firm

would handle all legal research necessary to take Inmate #3's case to trial. They were told the fee

6

included all investigations, interviews, expert witness testimony and trial preparation. As part of

the fee, EVANS would select several attorneys for Inmate #3 to interview. Inmate #3 was to

select one of the attorneys and EVANS would assist the attorney throughout the process.

20. On or about February 8, 2012, Inmate #3 signed a second contract with ROBERT

LEE EVANS for $45,000. In that contract EVANS was to assist Inmate #3 in hiring an attorney

and HRE would hold in escrow all attorney fees paid to HRE by Inmate #3 and Victim #3 until

an attorney was hired.

21. On or about February 13, 2012, Victim #3 wired $45,000 from her bank account

in California to an HRE account in Cleveland, Ohio. Prior to the transfer, ROBERT LEE

EVANS told Victim #3 that the $45,000 was needed as $20,000 would be paid to HRE, $20,000

was a first payment on a flat fee contract with an attorney, and $5,000 would be held in escrow to

cover any future unforeseen expenses.

22. On or about February 13-24, 2012, ROBERT LEE EVANS had a series of

conversations with Inmate #3 and pressed the idea that he, EVANS, should take a more proactive

role on Inmate #3's behalf. EVANS said he had an "ace in the hole" option. This option involved

EVANS arranging for someone to provide significant cooperation to law enforcement on

Inmate #3's behalf, thereby earning Inmate #3 "third party assistance credit" at sentencing. An

additional phase of the "ace in the hole" involved additional "third party assistance" after

Inmate #3 was sentenced. He would get more credit and a reduction after a motion was filed.

EVANS told Inmate #3 this plan required an additional $50,000 up front and another $50,000

7

after the post-sentencing credit was applied. Evans told Inmate #3 that he would get credit for a 15 to 20 kilogram bust involving two people.

23.     On or about February 24, 2012, during a telephone conversation, ROBERT LEE EVANS told Inmate #3 that his sentence would be reduced from 15 years to six or seven years and eventually down to six months and a halfway house by applying the "third party credit" and the post-sentencing motion. EVANS said Inmate #3 would get a bond.

24.     On or about March 1, 2012, during a telephone conversation ROBERT LEE EVANS told Inmate #3 that he could work a deal which required Inmate #3 to proffer and plead guilty. There would be "third party assistance." EVANS further told Inmate #3 that his "kid" already had someone lined up. EVANS further said that he spoke with "agents" and that he met with everyone about this deal and they were okay with the deal. EVANS further said the agents had already met with the "kid."

25.     On or about March 1, 2012, during a second telephone conversation with Inmate #3, ROBERT LEE EVANS again said that his "kid" was going to set someone up for "15 Keys." Later in the conversation, EVANS said the "kid" would set up another 10 to 15 kilo deal on Inmate #3's behalf. EVANS told Inmate #3 that with the second deal he would be sent to a halfway house.

26.     In or around late February through on or about March 5, 2012, ROBERT LEE EVANS, on several occasions, met with Victim #3 and/or spoke with her on the telephone. During these meetings and phone calls, EVANS told Victim #3 that third party assistance credit was credit given to the defendant at sentencing based on positive work done for law enforcement

8

by a third party on the defendant's behalf. EVANS said that he could arrange two instances of

third party assistance for Inmate #3. One instance would occur before Inmate #3 was sentenced

and he would get credit or a reduction in his sentence because of the third party assistance.

EVANS further told Victim #3 that after Inmate #3 was sentenced he would set up a second drug

deal for law enforcement. EVANS said this would get Inmate #3 a further reduction. EVANS

told Victim #3 that each instance of third party cooperation would cost $50,000. EVANS also

told her that if she paid the first $50,000, he would be able to get Inmate #3 released on bond.

27.     On or about March 5, 2012, EVANS gave the attorney he arranged to represent

Inmate #3 a $10,000 check from HRE.

28.     Based on ROBERT LEE EVANS' assurances of a greatly reduced sentence and a

bond, EVANS caused Inmate #3 and Victim #3 to proceed with EVANS' plan, and on March 6,

2012, Victim #3 wired $50,000 from her account in California to the account designated by

EVANS. ROBERT LEE EVANS and an unindicted co-conspirator took the money.

29.     On or about March 9, 2012, during a telephone conversation with Inmate #2,

ROBERT LEE EVANS said, "Okay. And, and if that fails, then I'm gonna push it all the way to

the Supreme Court. And if that fails, I got an ace in the hole." EVANS then explained third

party assistance credit to Inmate #2.

30.     In or about January 2012 to March 2012, ROBERT LEE EVANS took $1,000

cash from Victim #2 as a first payment for third party assistance.

31.     In or about late February 2012 through on or about May 14, 2013, ROBERT LEE

EVANS, on numerous occasions, reassured Victim #3 that all was going well with the third party

9

work, and that the government was happy with the third party assistance. EVANS further told Victim #3 that he was setting up drug deals for law enforcement and all was going well.

32.   In or about March or April 2012, ROBERT LEE EVANS took $2,000 in cash from Victim #2. At the time EVANS took the cash, he led Victim #2 to believe he was on the telephone speaking with Billy. EVANS said Billy wanted $7,000 to set up the third party assistance and so the victim still owed $4,000.

33.   On or about May 14, 2012, Victim #3, following ROBERT LEE EVANS' directions, wired $10,000 from her bank account to an account designated by EVANS and placed a $10,000 cashier's check in the United States mail addressed to ROBERT LEE EVANS.

34.   On or about May 31, 2012, during a telephone call, ROBERT LEE EVANS told Inmate #3 that "Billy" was making arrangements for the next phase of third party assistance to take place. EVANS told Inmate #3 that "Billy" was working on "the Rule 35, which is the other part of what you paid for." Later in the conversation, EVANS explained how "Billy" was going to work the second half of the third party assistance prior to Inmate #3's sentencing.

35.   On or about June 19, 2012, ROBERT LEE EVANS told Victim #3 that all would be taken care of in a Rule 35 motion.

36.   On or about June 18, 2012, ROBERT LEE EVANS told Inmate #3 that everything was going according to plan. EVANS further said that he had done his part, Attorney XXX had done his part, and "Billy" did his part.

37.   On or about the last week in June 2012, ROBERT LEE EVANS told Victim #2 that he would have to go to prison for 30 to 60 days before a Rule 35 motion would be presented

10

and the credit applied. EVANS further said Victim #2 would then be released on an "ankle

bracelet." EVANS then convinced Victim #2 to have him (EVANS) operate Victim #2's car

business while Victim #2 was in prison. EVANS drafted a contract to that effect which

Victim #2 signed.

38.     On or about June 27, 2012, ROBERT LEE EVANS caused Victim #3 to wire

$1,500 from her bank account in California into a bank account designated by EVANS.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2

The Grand Jury further charges:

1.     From in or around October 2011, and continuing up to and including

approximately June 2012,  the exact dates unknown, in the Northern District of Ohio, Eastern

Division, and elsewhere, the defendant,  ROBERT LEE EVANS, together and with others known

and unknown to  the Grand Jury, did knowingly and intentionally combine, conspire,

confederate, and agree together and with diverse other persons, both known and unknown to the

Grand Jury, to commit certain offenses in violation of Title 18, United States Code, Sections

1956 and 1957 as follows:

2.     To conduct and attempt to conduct financial transactions affecting interstate

commerce, which transactions involved the proceeds of specified unlawful activity; that is,

Fraud by Mail, in violation of Title 18, United States Code, Section 1341, and Fraud by Wire, in

violation of Title 18, United States Code, Section 1343, with intent to promote the carrying on of

such specified unlawful activities, and knowing that the transactions were designed in whole or

11

in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activities, and that while conducting and attempting to conduct said financial transactions knowing that the property involved in the financial transactions represented proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1), and knowingly to engage, attempt to engage, and engaging in monetary transactions in criminally derived property that was of a value greater than $10,000, in violation of Title 18, United States Code, Section 1957.

3.    It was part of the conspiracy that at least two bank checking accounts were opened and proceeds of unlawful activities were deposited and or transferred thereto.

4.    It was further part of the conspiracy that after the proceeds of the mail fraud and wire fraud were placed in checking accounts, ROBERT LEE EVANS and an unindicted co-conspirator used them in financial transactions to promote and advance their mail and wire fraud activities.

5.    It was further part of the conspiracy that ROBERT LEE EVANS and an unindicted co-conspirator used the proceeds of the mail and wire fraud to pay their personal expenses and support their lifestyle.

**ACTS IN FURTHERANCE OF THE CONSPIRACY**

6.    In furtherance of the conspiracy and to affect the objects thereof, the defendant and others, in the Northern District of Ohio, and elsewhere, performed the following acts:

12

7.  On or about October 21, 2011, ROBERT LEE EVANS and an unindicted co-conspirator opened Charter One Bank business checking account #X96-8 at Charter One Branch #545.

8.  On or about February 9, 2012, an unindicted co-conspirator opened Charter One Client Trust checking account #X61-0 at Charter One Branch #545.

9.  On or about February 13, 2012, ROBERT LEE EVANS told an individual (Victim #3 from Count 1 above), to wire transfer $45,000 to Charter One Bank account #X96-8.

10.  On or about February 13, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $35,000 to be transferred from Charter One account #X96-8 to Charter One account #X61-0.

11.  On or about February 15, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $4,000 to be transferred from Charter One account #X61-0 to Charter One account #X96-8.

12.  On or about February 23, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $1,000 to be transferred from Charter One account #X61-0 to Charter One account #X96-8.

13.  On or about February 23, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $500 to be transferred from Charter One account #X61-0 to Charter One account #X96-8.

13

14.     On or about February 27, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $2,000 to be transferred from Charter One account #X61-0 to Charter One account #X96-8.

15.     On or about March 5, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $1,519.04 to be transferred from Charter One account #X61-0 to Charter One account #X96-8.

16.     On or about March 6, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $2,000 to be transferred from Charter One account #X61-0 to Charter One account #X96-8.

17.     On or about March 6, 2012, ROBERT LEE EVANS told an individual (Victim #3 from Count 1 above), to wire transfer $50,000 to Charter One Bank account #X96-8.

18.     On or about March 6, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $50,000 to be transferred from Charter One account #X96-8 to Charter One account #X61-0.

19.     On or about March 6, 2010, an unindicted co-conspirator wrote a check from Charter One Bank account #X61-0 in the amount of $10,000 to an individual known to the Grand Jury.

20.     On or about March 12, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $10,000 to be transferred from Charter One account #X61-0 to Charter One account #X96-8.

14

21.    On or about March 13, 2012, an unindicted co-conspirator caused/allowed $5,000 to be withdrawn from Charter One account #X61-0.

22.    On or about March 13, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $1,000 to be transferred from Charter One account #X61-0 to Charter One account #X96-8.

23.    On or about March 12, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $1,000 to be transferred from Charter One account #X61-0 to Charter One account #X96-8.

24.    On or about March 20, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $20,000 to be transferred from Charter One account #X61-0 to an account bearing #X69-6.

25.    On or about March 20, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $8,000 to be transferred from Charter One account #X61-0 to Charter One account #X96-8.

26.    On or about March 20, 2012, ROBERT LEE EVANS and an unindicted co-conspirator withdrew $8,000 from Charter One account #X96-8.

27.     On or about March 30, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $4,000 from checking account #X696 TCB Premier to Charter One account #X96-8.

28.    On or about April 5, 2012, ROBERT LEE EVANS and an unindicted co-conspirator withdrew $2,330 in cash from Charter One account #X96-8.

15

29.     On or about April 6, 2012, ROBERT LEE EVANS and an unindicted co-conspirator withdrew $1,000 in cash from Charter One account #X96-8.

30.     On or about April 10, 2012, ROBERT LEE EVANS and an unindicted co-conspirator withdrew $6,000 in cash from Charter One account #X96-8.

31.     On or about April 10, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $4,000 to be transferred from Charter One account #X96-8 to Charter One account #X61-0.

32.     On or about April 10, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused $500 to be transferred from Charter One account #X96-8 to Charter One account #X61-0.

33.     On or about April 10, 2012, ROBERT LEE EVANS and an unindicted co-conspirator transferred $300 from Charter One account #X61-0 to Charter One account #X96-8.

34.     On or about April 10, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $5,700 from checking account #X696 TCB Premier to Charter One account #X96-8.

35.     On or about April 10, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $250 from checking account #X696 TCB Premier to Charter One account #X96-8.

36.     On or about April 12, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $1,500 from checking account #X696 TCB Premier to Charter One account #X96-8.

16

37.     On or about April 16, 2012, an unindicted co-conspirator closed Charter One account #X61-0 with a $4,000 cash withdrawal.

38.     On or about April 16, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $1,000 from checking account #X696 TCB Premier to Charter One account #X96-8.

39.     On or about April 18, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $1,500 from checking account #X696 TCB Premier to Charter One account #X96-8.

40.     On or about April 24, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $500 from checking account #X696 TCB Premier to Charter One account #X96-8.

41.     On or about April 25, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $250 from checking account #X696 TCB Premier to Charter One account #X96-8.

42.     On or about April 26, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $250 from checking account #X696 TCB Premier to Charter One account #X96-8.

43.     On or about May 2, 2012, ROBERT LEE EVANS and an unindicted co-conspirator withdrew $4,000 in cash from Charter One account #X69-8.

44.     On or about May 2, 2012, ROBERT LEE EVANS and an unindicted co-conspirator deposited $10,000 in cash into Charter One account #X69-8.

45.　On or about May 3, 2012, ROBERT LEE EVANS and an unindicted co-conspirator made a $6,500 payment towards a purchase of real estate by check # 2003 written on Charter One account #X69-8.

46.　On or about May 9, 2012, ROBERT LEE EVANS and an unindicted co-conspirator deposited $1,900 cash into Charter One account #X69-8.

47.　On or about May 14, 2012, Victim #3 (count 1 above), following ROBERT LEE EVANS' directions, wired $10,000 from her bank account to Charter One account #X96-8 and placed a $10,000 cashier's check in the United States mail addressed to ROBERT LEE EVANS.

48.　On or about May 15, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused an online transfer of $8,800 from Charter One account #X96-8 to checking account #X696 TCB Premier.

49.　On or about May 18, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $500 from checking account #X696 TCB Premier to Charter One account #X96-8.

50.　On or about May 21, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $500 from checking account #X696 TCB Premier to Charter One account #X96-8.

51.　On or about May 21, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $400 from checking account #X696 TCB Premier to Charter One account #X96-8.

18

52.     On or about May 22, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $100 from checking account #X696 TCB Premier to Charter One account #X96-8.

53.     On or about May 23, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $1,250 from checking account #X696 TCB Premier to Charter One account #X96-8.

54.     On or about May 25, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $1,000 from checking account #X696 TCB Premier to Charter One account #X96-8.

55.     On or about June 4, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $1,000 from checking account #X696 TCB Premier to Charter One account #X96-8.

56.     On or about June 8, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $2,000 from checking account #X696 TCB Premier to Charter One account #X96-8.

57.     On or about June 11, 2012, ROBERT LEE EVANS and an unindicted co-conspirator caused the online transfer of $900 from checking account #X696 TCB Premier to Charter One account #X96-8.

58.     On or about June 27, 2012, Victim #3 (count 1 above), following ROBERT LEE EVANS' directions, wired $1,500 from her bank account to Charter One account #X96-8.

All in violation of Title 18, United States Code, Section 1956(h).

19

## COUNT 3

On or about the September 13, 2012, in the Northern District of Ohio, Eastern Division, and elsewhere, the defendant, ROBERT LEE EVANS, did willfully and knowingly make and cause to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of a department or agency of the United States by stating to Special Agents of the Federal Bureau of Investigation at the U.S. Courthouse in Cleveland in the Northern District of Ohio:

(1) that he never received money from inmates or representatives of inmates for "third party assistance" or assistance on behalf of an inmate to reduce a prison sentence. The statement and representation was false because, as ROBERT LEE EVANS then and there knew, Victim #3 paid him $50,000 for third party assistance on behalf of Inmate #3;

(2) that he never received any money from Victim #2. The statement and representation was false because, as ROBERT LEE EVANS then and there knew, Victim #2 paid him $3,000 in cash for third party assistance;

(3) that he received approximately $34,500 from Victim #3. The statement and representation was false because, as ROBERT LEE EVANS then and there knew, Victim #3 paid ROBERT LEE EVANS a total of $116,250 on behalf of Inmate #3.

(4) that he never accepted any money from Victim #3. The statement and representation was false because, as ROBERT LEE EVANS then and there knew, Victim #3 wire transferred monies to him or HRE in the amounts of $45,000, $50,000, $10,000 and $1,250 along with a cashier's check for $10,000 on behalf of Inmate #3;

20

(5)  that he paid an attorney known to the grand jury $17,000 for legal representation of Inmate #3.  The statement and representation was false because, as ROBERT LEE EVANS then and there knew, he paid the attorney only $10,000 for said legal representation; and

(6)  that he repaid Victim #3 monies for legal representation of Inmate #3.  The statement and representation was false because, as ROBERT LEE EVANS then and there knew, Victim #3 never received any repayment from ROBERT LEE EVANS.

All in violation of Title 18, United States Code, Section 1001.

A TRUE BILL

Original document -- Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.