IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | SUPERSEDING INDICTMENT |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | CASE NO. __1:14CR237__ |
| ROBERT LEE EVANS, | ) | 18 USC § 1341 |
| | ) | 18 USC § 1343 |
| Defendant. | ) | 18 USC § 1957 |
| | ) | 18 USC § 1001 |

## GENERAL ALLEGATIONS

The Grand Jury Charges:

At all times material and relevant to this Superseding Indictment:

**The Defendant and Associated Entity**

1. The defendant, ROBERT LEE EVANS, was a resident of Parma, Ohio, which is located in the Northern District of Ohio, Eastern Division. ROBERT LEE EVANS was co-founder and co-owner of a legal research firm known as Holowatyj, Roza, & E. Law Research L.L.C. (hereinafter referred to as "HRE").

**Evans' Scheme to Defraud Criminal Defendants, Their Families, and Others**

2. Defendant ROBERT LEE EVANS devised a scheme to enrich himself by fraudulently obtaining thousands of dollars from inmates, in federal and state custody, their

families and loved ones by playing on their hopes and desires to obtain a favorable or less onerous resolution of their or their family members' criminal charges.

3. From at least as early as February 2011, ROBERT LEE EVANS himself, and through inmates, recruited incarcerated inmates as clients of his legal research firm. EVANS described his services as a full service legal research firm and that he would help the inmate find an attorney and generally encouraged the newly-recruited clients to change attorneys and hire those he recommended.

4. ROBERT LEE EVANS told the clients that he was a private investigator and would assist the attorney throughout the court process. All fees were paid to EVANS who would then pay the attorney for legal services. EVANS required a substantial retainer to be paid before any work would be done for the client.

5. As matters proceeded and the clients wanted more favorable results, ROBERT LEE EVANS would play on their desires for reduction in potential sentences, or a reduction in sentences already imposed, and would tell them he had an "ace in the hole" option. EVANS explained his plan involved two phases: the first involved EVANS arranging for someone to provide significant cooperation to law enforcement on the client's behalf thereby acquiring for the client "third party assistance" credit at the time of the client's sentencing; and second, EVANS arranging after the client had served part of the sentence, (1) for the government to file a motion requesting that the client's sentence be reduced; and (2) the motion be granted. EVANS required substantial additional payment for the "ace in the hole" treatment.

6. Once the client agreed to go forward with the "ace in the hole" option, ROBERT LEE EVANS would tell the client and/or his family/loved ones that some third party cooperation had already occurred, for which the client would get credit, when in fact there had been no such

cooperation. EVANS would then press the client/client's family/client's loved ones for more money.

7. ROBERT LEE EVANS and a person known to the grand jury opened bank accounts in the name of HRE, deposited payments from clients, made payments relating to the scheme to defraud and withdrew therefrom proceeds of the fraudulent activities.

8. The same person referred to in paragraph 7 also acted as a liaison with the fiancé of an inmate targeted for the scam.

9. To further the scheme to defraud and to add credibility to his representations about his business and abilities to deliver on his promises, ROBERT LEE EVANS used stationery, letterhead and a business card from a law office where he had previously worked to entice the father of an inmate serving time in a Bureau of Prisons facility at Fort Dix, New Jersey, to hire him and pay a retainer for his services.

10. On or about April 15, 2011, ROBERT LEE EVANS caused a Client Intake Form for a person known to the grand jury and hereinafter referred to as Victim #1, to be filled out.

11. On or about April 28, 2011, ROBERT LEE EVANS had Victim #1 sign a Client Contract.

12. On or about April 28, 2011, ROBERT LEE EVANS received a $6,179 check from Victim #1.

13. In or about sometime in late spring to the summer of 2011, ROBERT LEE EVANS told Victim #1's son (hereinafter Inmate #1), who was then an inmate at the BOP facility in Fort Dix, New Jersey, that a "sting" was being set up and he, the inmate, would get credit from law enforcement for the "sting" and his sentence would be reduced when in fact no such "sting" had been or was being arranged.

14. In or about early January 2012, ROBERT LEE EVANS spoke to the mother and brother (hereinafter Victim #2) of a person then incarcerated in the Northeast Ohio Correctional Center (hereinafter NEOCC), Youngstown, Ohio, (hereinafter Inmate #2) about obtaining a favorable result in Inmate #2's case for a fee. At that time, Victim #2 was also facing criminal charges and he had a conversation with ROBERT LEE EVANS about EVANS helping Victim #2 received a shorter sentence of incarceration. EVANS told him about third party cooperation and how it could help him. EVANS said he knew a person who was a former Marine named "Billy" whose street name is "LT." EVANS explained that Billy set up people to be busted by law enforcement. Billy would communicate with the agents working the case that he was assisting on the bust in order to give third party credit to another. If Victim #2 chose to use EVANS' services, Billy would set up another bust to credit Victim #2.

15. In or about January 2012 to March 2012, ROBERT LEE EVANS took $1,000 cash from Victim #2 as a first payment for third party assistance.

16. On or around January 26, 2012, ROBERT LEE EVANS, during a telephone conversation, encouraged Inmate #2 to get a retainer paid. EVANS stated, "We need that like ASAP, man. You know what I mean?"

17. In or around late January 2012, an inmate at NEOCC referred another inmate (hereinafter Inmate #3) to ROBERT LEE EVANS. Thereafter Inmate #3 and his fiancé (hereinafter Victim #3) spoke with ROBERT LEE EVANS about EVANS' services and what he could accomplish on behalf of Inmate #3.

18. On or about February 3, 2012, ROBERT LEE EVANS, during a telephone conversation with Inmate #2, asked "What's going on with your family, man?" Inmate #2

4

responded, "They're getting the money together, man." During this conversation, EVANS told Inmate #2 that he was supposed to do some things for Inmate #2's brother.

19. On or about February 4, 2012, Inmate #3 signed a flat fee contract with ROBERT LEE EVANS for $20,000. This was after EVANS told Inmate #3 and Victim #3 that his firm would handle all legal research necessary to take Inmate #3's case to trial. EVANS told them the fee included all investigations, interviews, and expert witness testimony and trial preparation. As part of the fee, EVANS would select several attorneys for Inmate #3 to interview. Inmate #3 was to select one of the attorneys and EVANS would assist the attorney throughout the process.

20. On or about February 8, 2012, Inmate #3 signed a second contract with ROBERT LEE EVANS for $45,000. In that contract EVANS was to assist Inmate #3 in hiring an attorney and HRE would hold in escrow all attorney fees paid to HRE by Inmate #3 and Victim #3 until an attorney was hired.

21. On or about February 13, 2012, Victim #3 wired $45,000 from her bank account in California to an HRE account in Cleveland, Ohio. Prior to the transfer, ROBERT LEE EVANS told Victim #3 that the $45,000 was needed as $20,000 would be paid to HRE, $20,000 was a first payment on a flat fee contract with an attorney, and $5,000 would be held in escrow to cover any future unforeseen expenses.

22. In or about February 13-24, 2012, ROBERT LEE EVANS had a series of conversations with Inmate #3 and pressed the idea that he, EVANS, should take a more proactive role on Inmate #3's behalf. EVANS said he had an "ace in the hole" option. This option involved EVANS arranging for someone to provide significant cooperation to law enforcement on Inmate #3's behalf, thereby earning Inmate #3 "third party assistance credit" at sentencing. An additional phase of the "ace in the hole" involved additional "third party assistance" after

5

Inmate #3 was sentenced. He would get more credit and a reduction after a motion was filed. EVANS told Inmate #3 this plan required an additional $50,000 up front and another $50,000 after the post-sentencing credit was applied. EVANS told Inmate #3 that he would get credit for a 15 to 20 kilogram cocaine bust involving two people.

23. On or about February 24, 2012, during a telephone conversation, ROBERT LEE EVANS told Inmate #3 that his sentence would be reduced from 15 years to six or seven years and eventually down to six months and a halfway house by applying the "third party credit" and the post-sentencing motion.

24. On or about March 1, 2012, during a telephone conversation, ROBERT LEE EVANS told Inmate #3 that he could work a deal which required Inmate #3 to proffer and plead guilty. There would be "third party assistance." EVANS further told Inmate #3 that his "kid" already had someone lined up. EVANS further said that he spoke with "agents" and that he met with everyone about this deal and they were okay with the deal. EVANS further said the agents had already met with the "kid." As of March 1, 2012, EVANS well knew these statements were false. Further, as EVANS then knew, the agents had not approved the arrangement nor had they met with the "kid" in relation to any "3rd party assistance."

25. On or about March 1, 2012, during a second telephone conversation with Inmate #3, ROBERT LEE EVANS again said that his "kid" was going to set someone up for "15 Keys." Later in the conversation, EVANS said the "kid" would set up another 10 to 15 kilo deal on Inmate #3's behalf. EVANS told Inmate #3 that with the second deal he would be sent to a halfway house.

26. In or around late February through on or about March 5, 2012, ROBERT LEE EVANS, on several occasions, met with Victim #3 and/or spoke with her on the telephone.

6

During these meetings and phone calls, EVANS told Victim #3 that third party assistance credit was credit given to the defendant at sentencing based on positive work done for law enforcement by a third party on the defendant's behalf. EVANS said that he could arrange two instances of third party assistance for Inmate #3. One instance would occur before Inmate #3 was sentenced and he would get credit or a reduction in his sentence because of the third party assistance. EVANS further told Victim #3 that after Inmate #3 was sentenced, he would set up a second drug deal for law enforcement. EVANS said this would get Inmate #3 a further reduction. EVANS told Victim #3 that each instance of third party cooperation would cost $50,000. EVANS also told her that if she paid the first $50,000, he would be able to get Inmate #3 released on bond. The bond promise was something EVANS well knew at that time he could not ensure but made the claim to entice Victim #3 to pay the initial $50,000.

27. Based on ROBERT LEE EVANS' assurances of a greatly reduced sentence and a bond, EVANS caused Inmate #3 and Victim #3 to proceed with EVANS' plan, and on March 6, 2012, Victim #3 wired $50,000 from her account in California to the account designated by EVANS. ROBERT LEE EVANS and a person known to the grand jury took the money.

28. On or about March 9, 2012, during a telephone conversation with Inmate #2, ROBERT LEE EVANS said, "Okay. And, and if that fails, then I'm gonna push it all the way to the Supreme Court. And if that fails, I got an ace in the hole." EVANS then explained third party assistance credit to Inmate #2.

29. In or about late February 2012 through on or about May 14, 2012, ROBERT LEE EVANS, on numerous occasions, falsely reassured Victim #3 that all was going well with the third party work, and that the government was happy with the third party assistance. EVANS

7

further falsely told Victim #3 that he was setting up drug deals for law enforcement and all was going well. EVANS made these false assurances to induce Victim #3 to give him more money.

30. In or about March or April 2012, ROBERT LEE EVANS took $2,000 in cash from Victim #2. At the time EVANS took the cash, he led Victim #2 to believe he was on the telephone speaking with Billy. EVANS said Billy wanted $7,000 to set up the third party assistance and so the victim still owed $4,000. (Victim #2 provided $1,000 to EVANS earlier. See paragraph 15.)

31. On or about May 14, 2012, Victim #3, encouraged by ROBERT LEE EVANS' previous false representations and following EVANS' directions, wired $10,000 from her bank account to an account designated by EVANS and placed a $10,000 cashier's check addressed to ROBERT LEE EVANS in the United States mail.

32. On or about May 31, 2012, during a telephone call, ROBERT LEE EVANS, although nothing had been arranged in relation to the first phase, told Inmate #3 that "Billy" was making arrangements for the next phase of third party assistance to take place. EVANS told Inmate #3 that "Billy" was working on "the Rule 35, which is the other part of what you paid for." Later in the conversation, EVANS explained how "Billy" was going to work the second half of the third party assistance prior to Inmate #3's sentencing. These representations were made to entice Inmate #3, through Victim #3, to provide more money to EVANS.

33. On or about June 19, 2012, ROBERT LEE EVANS told Victim #3 that all would be taken care of in a Rule 35 motion.

34. On or about June 18, 2012, ROBERT LEE EVANS told Inmate #3 that everything was going according to plan. EVANS further said that he had done his part, the attorney had done his part, and "Billy" did his part.

8

35. In or about the last week in June 2012, ROBERT LEE EVANS told Victim #2 that he would have to go to prison for 30 to 60 days before a Rule 35 motion would be presented and the credit applied. EVANS further said Victim #2 would then be released on an "ankle bracelet." EVANS then convinced Victim #2 to have him (EVANS) operate Victim #2's car business while Victim #2 was in prison. EVANS drafted a contract to that effect which Victim #2 signed.

36. On or about June 27, 2012, ROBERT LEE EVANS caused Victim #3 to wire $1,500 from her bank account in California into a bank account designated by EVANS.

## STATUTORY CHARGES

### COUNT 1
### Wire Fraud, 18 U.S.C. § 1343

The Grand Jury charges:

37. The allegations in paragraphs 1 through 36 of the General Allegations are re-alleged and incorporated by reference in this count, as if fully restated herein.

### Scheme to Defraud

38. From approximately April 2011 through September 2012, the defendant, ROBERT LEE EVANS, devised and intended to devise a scheme and artifice to defraud and obtain money by means of false and fraudulent pretenses and representations, to wit, the scheme to defraud inmates in federal and state custody, their families and loved ones alleged in paragraphs 2 through 36 of the General Allegations above.

### Use of the Wires

39. On or about the dates listed below, in the Northern District of Ohio, Eastern Division, and elsewhere, the defendant, ROBERT LEE EVANS, for the purpose of executing the

scheme and artifice, transmitted and caused to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, pictures and sounds, as set forth below:

**Emails**

a. On various dates, including but not limited to the following, EVANS sent or caused to be sent emails from Ohio, to Victim #3 in California, each to advance the scheme and artifice:

| Date and time | Addressee |
|---|---|
| February 4, 2012  12:37 AM | Xxxxxxillusion@yahoo.com |
| February 8, 2012  4:52 PM | Xxxxxxillusion@yahoo.com |
| March 13, 2012  9:33 PM | Xxxxxxillusion@yahoo.com |
| March 27, 2012  12:35 AM | Xxxxxxxxxxxx2be@aim.com; Xxxxxxillusion@yahoo.com |

**Wire Transfers**

a. On or about April 29, 2011, ROBERT LEE EVANS caused a wire-transfer of funds ($750) by Western Union money transfer from a person, known to the grand jury, in the Commonwealth of Pennsylvania to EVANS in the Cleveland, Ohio, area, said transaction was conducted to advance the scheme and artifice:

b. On various dates, including but not limited to the following, EVANS caused wire-transfers of funds from a financial account of Victim #3 located outside of the State of Ohio to an account controlled by EVANS at RBS Citizens Financial N.A., dba Charter One, 5733 Broadway Ave., Cleveland, Ohio (hereinafter "Charter One"), each to advance the scheme and artifice :

10

| Approximate date | Wire transfer |
|---|---|
| February 2, 2012 | $45,000 from Chase account of Victim #3 to Charter One to the credit of an account held by HRE. |
| March 6, 2012 | $50,000 from Chase account of Victim #3 to Charter One to the credit of an account held by HRE. |
| May 14, 2012 | $10,000 from Chase account of Victim #3 to Charter One to the credit of an account held by HRE. |
| June 27, 2012 | $1,500 from Chase account of Victim #3 to Charter One to the credit of an account held by HRE. |

**Text messages**

a. On various dates, including but not limited to the following, EVANS sent or caused to be sent text messages from Ohio, to Victim #3 in California, each to advance the scheme and artifice:

| Date and time | Addressee |
|---|---|
| February 5, 2012 10:16 PM | Victim #3 |
| February 5, 2012 10:17 PM | Victim #3 |
| February 5, 2012 12:49 PM | Victim #3 |
| February 7, 2012 01:15 AM | Victim #3 |
| February 17, 2012 08:50 PM | Victim #3 |

In violation of Title 18, United States Code, Section 1343.

11

## COUNT 2
Mail Fraud, 18 U.S.C. § 1341

The Grand Jury further charges:

1. The allegations in paragraphs 1 through 36 of the General Allegations are re-alleged and incorporated by reference in this count, as if fully restated herein.

### Scheme to Defraud

2. From approximately April 2011 through September 2012, the defendant, ROBERT LEE EVANS, devised and intended to devise a scheme and artifice to defraud and obtain money by means of false and fraudulent pretenses and representations, to wit, the scheme to defraud inmates in federal and state custody, their families and loved ones alleged in paragraphs 2 through 36 of the General Allegations above.

### Use of the Mails

3. On or about May 14, 2012, in the Northern District of Ohio, Eastern Division, and elsewhere, the defendant, ROBERT LEE EVANS, for the purpose of executing the aforesaid scheme and artifice, and attempting to do so, knowingly caused to be delivered by the United States mail according to the directions thereon, an envelope containing a cashier's check in the amount of $10,000 mailed from the State of California to HRE in the State of Ohio by Victim #3.

In violation of Title 18, United States Code, Section 1341.

## COUNTS 3, 4 and 5
Engaging in Monetary Transactions in Property
Derived from Unlawful Activity
18 U.S.C. § 1957

The Grand Jury further charges:

On or about the dates listed below, in the Northern District of Ohio, Eastern Division, and elsewhere, the defendant, ROBERT LEE EVANS, did knowingly engage and attempt to engage

in monetary transactions, by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is causing or directing another to cause interbank transfers of fund listed below between HRE accounts # xxxxxxxx68, #xxxxxxxx10 and #xxxxxxxx96 at RBS Citizens, N.A., dba Charter One, such property, to wit, the funds on deposit in said Charter One accounts having been derived from specified unlawful activity, that is Wire Fraud a violation of Title 18, United States Code, Section 1343 and Mail Fraud a violation of Title 18, United States Code, Section 1341:

| Count | Date | Sending Account | Receiving Account | Transfer Amount |
|---|---|---|---|---|
| 3 | 02/13/2012 | xxxxxxxx68 | xxxxxxxx10 | $35,000 |
| 4 | 03/06/2012 | xxxxxxxx68 | xxxxxxxx10 | $50,000 |
| 5 | 03/20/2012 | xxxxxxxx10 | xxxxxxxx96 | $20,000 |

In violation of Title 18, United States Code, Section 1957

### COUNT 6
False Statements
18 U.S.C. § 1001

On or about the September 13, 2012, in the Northern District of Ohio, Eastern Division, and elsewhere, the defendant, ROBERT LEE EVANS, did willfully and knowingly make and cause to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of a department or agency of the United States by stating to Special Agents of the Federal Bureau of Investigation at the U.S. Courthouse in Cleveland in the Northern District of Ohio:

1. That he never received money from inmates or representatives of inmates for "third party assistance" or assistance on behalf of an inmate to reduce a prison sentence. The statement and representation was false because, as ROBERT LEE EVANS then and there knew, Victim #3 paid him $50,000 for third party assistance on behalf of Inmate #3;

13

2. That he never received any money from Victim #2. The statement and representation was false because, as ROBERT LEE EVANS then and there knew, Victim #2 paid him $3,000 in cash for third party assistance;

3. That he received approximately $34,500 from Victim #3. The statement and representation was false because, as ROBERT LEE EVANS then and there knew, Victim #3 paid ROBERT LEE EVANS a total of $116,500 on behalf of Inmate #3;

4. That he never accepted any money from Victim #3. The statement and representation was false because, as ROBERT LEE EVANS then and there knew, Victim #3 wire transferred monies to him or HRE in the amounts of $45,000, $50,000, $10,000 and $1,500 along with a cashier's check for $10,000 on behalf of Inmate #3;

5. That he paid an attorney known to the grand jury $17,000 for legal representation of Inmate #3. The statement and representation was false because, as ROBERT LEE EVANS then and there knew, he paid the attorney only $10,000 for said legal representation; and

6. That he repaid Victim #3 monies for legal representation of Inmate #3. The statement and representation was false because, as ROBERT LEE EVANS then and there knew, Victim #3 never received any repayment from ROBERT LEE EVANS.

All in violation of Title 18, United States Code, Section 1001.

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.